## STATE *vs.* MAINE CENTRAL RAILROAD COMPANY.

### Cumberland, 1876.—January 25, 1877.

#### *Railroad.*

The legislature may incorporate a new and distinct corporation out of two or more previously existing corporations.

By the act of 1857, c. 106, additional to an act to incorporate the Kennebec & Portland Railroad Company, that railroad was made subject to all the general laws of the state relating to railroads, and consequently became subject to the reserved right of the state to alter, amend, or repeal its charter.

By virtue of Stat. 1864, c. 238, § 4, the Leeds & Farmington Railroad Company became subject to the reserved right of the state to alter, amend, or repeal its charter.

The special act of consolidation of 1856, c. 651, is an act of incorporation, as well as of consolidation.

R. S., 1857, c. 46, authorizing the mortgagees of insolvent railroad corporations to form themselves into "a new and distinct" corporation is to be construed in connection with c. 46, § 17.

The general law of 1831, c. 503, by which the state reserves to itself the right to amend, alter or repeal all acts of incorporation subsequent to its passage, has been retained in all the revisions of the statutes, is in full force, and applies to all subsequent corporations, whether organized under general or special laws.

Where a *new* corporation is formed out of two or more previously existing corporations, and by the act is to "have the powers, privileges and immunities possessed by each of the corporations," whose union constitutes such new corporation, the new corporation will have only the privileges, powers and immunities, which the corporation with the fewest privileges, powers and immunities possessed and which were common to all.

When two or more corporations with a special immunity from general taxation, the amount of taxation being dependent upon certain precedent acts to be done by such corporations thus to be exempted, are incorporated into a new corporation, which is neither required nor able to do and perform the acts which are to precede such limited and special exemption from taxation, the new corporation thus created cannot claim such special exemption.

Immunity of taxation is not one of the franchises of a corporation.

ON AGREED STATEMENT OF FACTS sufficiently appearing in the opinion.

DEBT to recover a state tax.

*Plea nil debet*, with a brief statement that the statute, by authority of which the tax was assessed, is in conflict with the provision of their charter and of the constitution of this state and

of the United States in this, that it impairs the obligation of the contract in their charter.

*L. A. Emery*, attorney general, with whom was *R. P. Tapley*, for the state.

*J. H. Drummond & J. O. Winship*, for the railroad.

I. The Maine Central Railroad Company was originally formed by the consolidation of the Androscoggin & Kennebec, and the Penobscot & Kennebec Railroad Companies.

The charters of these two companies are identical in all matters affecting this case.

By the act of 1831, c. 503, acts of incorporation are liable to be amended, altered or repealed, at the pleasure of the legislature, "unless there shall have been inserted in such act of incorporation an express limitation or provision to the contrary."

In these charters there is inserted the express provision that they shall not be "revoked, annulled, altered, limited or restrained, without the consent of the corporation."

This clause prevents the legislature from taking away anything granted by these charters. *State* v. *Noyes*, 47 Maine, 189.

Both these charters provide that the corporations shall not be subject to any other tax than the one provided therein ; and the tax sued for is different from that.

This exemption was a contract which the legislature had no power to repeal. 2 Curt. 498. 15 Curt. 338. 21 Curt. 190, 230. 18 How. 331, 384. 1 Black. 436. 4 Wall. 143, 535. 8 Wall. 430, 439. 13 Wall. 264, 269. 15 Wall. 454, 460. 16 Wall. 244. 18 Wall. 206. 20 Wall. 36. 21 Wall. 492. 22 Wall. 215.

II. These two charters, therefore, contained valid exemption from taxation, and when the two companies were consolidated, this immunity passed to the consolidated company.

The act of consolidation 1856, c. 651, § 4, provides in express terms, that the "new corporation shall have all the powers, privileges and *immunities* possessed by each of the corporations" consolidated. Separate, they each possessed the same immunity from taxation ; consolidated, they possess the same immunity that each had, by the express terms of the act.

III. The consolidation under the act of 1873, was to be made and was made according to the terms of the act of 1856, giving the consolidated company, the same immunities which⋅ each separate company already had.

It is manifest that each portion of the consolidated railroad must be operated under the provisions of its original charter ; and the rights, powers and immunities of the consolidated company, for a given portion of the railroad must be found in the charter under which that portion was constructed. By the act of consolidation all these pass to the defendants.

This is the express decision of the supreme court of the United States in *Tomlinson* v. *Branch*, 15 Wall. 460 ; the *Delaware Railroad Tax case*, 18 Wall. 406 ; *Humphrey* v. *Pegues*, 16 Wall. 244 ; *Branch* v. *Charleston*, 2 Otto, 677 ; *Central Railroad and Banking Co.* v. *Georgia*, 2 Otto, 665.

In these cases, it is held that if a company with an immunity from taxation consolidates with one without such immunity, the consolidated company has the immunity as to the road of the former, and not as to the road of the latter.

The last case also decides that an act authorizing such a consolidation, passed after the enactment of a law like our statute of 1833, does not subject the consolidated company to that law. The case last cited is directly in point, in favor of the defendants, upon every question thus far raised in this case.

But it is said that the charters of the two companies require certain duties to be performed in relation to the tax by certain officers of the company, and that those duties cannot be performed by the officers of the consolidated company, and therefore, the whole clause falls. But the act of the consolidation requires the officers of the consolidated company to perform all the acts required from either of the two companies ; and one familiar with railroads knows that the tolls are based upon the miles traveled, and that it is as easy to make returns of the earnings of each portion of the consolidated road, as it was of each road when operated separately from the other.

APPLETON, C. J. This is an action of debt to recover of the defendant corporation a tax duly assessed upon its "corporate

franchise" in accordance with the provisions of c. 258, of the laws of 1874, and c. 115, of the laws of 1876.

The defendant corporation is composed of what were originally five several railroad corporations. It is the result of two consolidations.

The Androscoggin & Kennebec Railroad Company was incorporated March 28, 1845, and was afterwards organized, and constructed its railroad from Waterville to Danville.

The Penobscot & Kennebec Railroad Company was incorporated April 7, 1845, was afterwards organized, and constructed its railroad from Bangor to Waterville, where it connected with the Androscoggin & Kennebec Railroad.

In accordance with the provisions of "an act to authorize the consolidation of certain railroad corporations," approved April 1, 1856, and amended March 17, 1862, by the repeal of the ninth section thereof, the Androscoggin & Kennebec, and the Penobscot & Kennebec railroad companies were consolidated into one corporation under the name of the Maine Central Railroad Company. This new corporation was organized on October 28, 1862, and it has ever since owned and operated the railroads of the two corporations of which it was composed.

The Kennebec & Portland Railroad Company was incorporated April 1, 1836 ; it was afterwards organized, and constructed a railroad from Augusta to Portland ; by a legislative authority it issued its bonds secured by a mortgage of its railroad and franchise ; in 1859, proceedings were commenced under R. S. 1857, c. 51, and on May 18, 1862, the foreclosure of its mortgage was perfected, and on May 20, 1862, a new corporation was formed by the holders of the bonds secured by said mortgage, under the law of 1857, under the name of the Portland & Kennebec Railroad Company, which owned and operated the railroad constructed by the Kennebec & Portland Railroad Company, until it was consolidated with the Maine Central Railroad Company.

The Somerset & Kennebec Railroad Company was chartered August 10, 1848, was organized, and constructed a railroad from Skowhegan to Augusta.

The Androscoggin Railroad Company was incorporated August

10, 1848, and was duly organized, and constructed a railroad from Farmington to Leeds Junction. By legislative authority it issued its bonds secured by a mortgage of its railroad and franchise. This mortgage was foreclosed under R. S. 1857, c. 51, on May 11, 1865; and the holders of its bonds secured by mortgage formed a corporation by the name of The Leeds & Farmington Railroad Company, which owned and operated said railroad.

On February 26, 1873, "an act for the consolidation of certain railroads" was passed by the legislature, by virtue of which the Portland and Kennebec Railroad Company, the Somerset & Kennebec Railroad Company and the Leeds & Farmington Railroad Company were consolidated with the Maine Central Railroad Company into one corporation; thus forming a new corporation, which retained the name of the Maine Central Railroad Company.

Since November 16, 1874, the Maine Central Railroad Company, under the last statutory consolidation, has owned and operated the railroads consolidated with it as well as the railroads before that time owned by itself and acquired by the previous consolidation to which we have referred.

The tax in controversy is assessed upon the new corporation as organized under the last act of consolidation.

The validity of the tax is denied. In defense it is urged that some or all of the corporations, by whose union under a new organization, the defendant corporation exists, were by their several charters made liable only to a special and conditional taxation, and that the state had restricted its general right of taxation to the limited taxation authorized in said charters, that these several charters constitute contracts with the state, and that the act under which the tax in controversy is assessed, is in violation of those contracts, by impairing their obligation, and is therefore, in contravention of the constitution of the United States, art. 1, § 10, which prohibits any state from passing any "law impairing the obligation of contracts."

The charters of the Penobscot & Kennebec Railroad Company and of the Androscoggin & Kennebec Railroad Company, each contained the following sections:

"Sec. 14. Said corporation shall keep, in a book for that pur-

pose, a regular account of all their disbursements, expenditures and receipts; and the books of said corporation shall be open at all times to the inspection of the governor and council, and of any committee duly authorized by the legislature; and at the expiration of every year, the treasurer of said corporation shall make an exhibit, under oath, to the legislature, of the net profits derived from the income of said railroad.

"Sec. 15. All real estate purchased by said corporation for the use of the same, under the fifth section of this act, shall be taxable to said corporation by the several towns, cities and plantations in which said lands may lie, in the same manner as lands owned by private persons, and shall in the valuation list be estimated the same as other real estate, of the same quality, in such town, city or plantation, and not otherwise; and the shares owned by the respective stockholders shall be deemed personal estate, and be taxable as such to the owners thereof, in the places where they reside and have their homes. And whenever the net income of said corporation shall have amounted to ten per centum per annum upon the cost of the road and its appendages, and incidental expenses, the directors shall make a special report of the fact to the legislature; from and after which time, one moiety or such other portion as the legislature may from time to time determine, of the net income from said railroad, accruing thereafter, over and above ten per centum per annum, first to be paid to the stockholders, shall annually be paid over by the treasurer of said corporation, as a tax, into the treasury of the state, for the use of the state. And the state may have and maintain an action against said corporation therefor to recover the same. But no other tax than herein is provided, shall ever be levied or assessed on said corporation, or any of their privileges or franchises."

"Sec. 17. The legislature shall at all times have the right to inquire into the doings of the corporation, and into the manner in which the privileges and franchises, herein and hereby granted, may have been used and employed by said corporation, and to correct and prevent all abuses of the same, and to pass any laws imposing fines and penalties upon said corporation, which may be necessary more effectually to compel a compliance with the pro-

visions, liabilities and duties, hereinbefore set forth and enjoined, but not to impose any other or further duties, liabilities or obligations. And this charter shall not be revoked, annulled, altered, limited or restrained, without consent of the corporation, except by due process of law."

By § 15, a tax may be imposed upon shares, and certain specified real estate of these corporations, but no tax is to be imposed upon the corporations until the net income of the same shall amount to ten per centum per annum, upon the cost of the road, &c., and then only one moiety or such other portion as the legislature may from time to time determine over and above ten per centum per annum, first to be annually paid to the stockholders.

It has been settled by a series of decisions, that a charter is a contract and that the state, having as one of the incidents of sovereignty the right to contract, may establish a special mode of taxation in its charter, to the exclusion of any other, or may limit the incidence of taxation, or exempt its chartered corporations from the burden entirely. The power to contract is all embracing. It embraces all subjects in which the interests of the state are involved, unless when restricted by constitutional prohibitions. The contracts of the state are as binding as those of individuals. It is not for the state to disregard its solemn contracts and to set the example of violating its own agreements.

It cannot make contracts and violate them at its own will and pleasure. Its contracts whether relating to taxation, or any other subject matter, are all alike within the protection of the constitution, which prohibits the impairing their obligation. In *Wilmington Railroad* v. *Reid*, 13 Wall. 264, Mr. Justice Davis says: "It has been so often decided by this court that a charter of incorporation granted by a state creates a contract between the state and the corporators, which the state cannot violate, that it would be a work of supererogation to repeat the reasons on which the argument is founded." In the *Delaware tax case*, 18 Wall. 206, Mr. Justice Field says: "That the charter of a private corporation is a contract between the state and the corporators, and within the provision of the constitution prohibiting legislation impairing the obligation of contracts, has been the settled law of this

court since the decision in the *Dartmouth college case.* Nor does it make any difference that the uses of the corporation are public, if the corporation itself be private. The contract is equally protected from legislative interference, whether the public be interested in the exercise of its franchise, or the charter be granted for the sole benefit of its corporators. This doctrine is not controverted by any one. It is the established law; and the question in all cases is whether the particular interference alleged does in fact impair the obligation of the contract; for it is not every kind of legislative interference with the powers, action and property of the corporation, which will have that result.

"It has also been repeatedly held in this court that the legislature may exempt particular parcels of property or the property of particular persons or corporations from taxation, either for a specified period or perpetually, or may limit the rate or amount of taxation, to which such property shall be subjected. And when such immunity is conferred, or such limitation is prescribed by the charter of a corporation, it becomes a part of the contract and is equally inviolate with its other stipulations." In *Humphrey* v. *Pegues,* 16 Wall. 244, 249, Mr. Justice Hunt uses the following language: "Another question is raised, to wit: that a legislature does not possess the power to grant to a corporation a perpetual immunity from taxation. It is said that the power of taxation is among the highest powers of a sovereign state; that its exercise is a political necessity, without which the state must cease to exist, and that it is not competent for one legislature, by binding its successors, to compass the death of the state. It is too late to raise this question in this court. It has been held that such a provision in the charter of an incorporation constitutes a contract which the state may not subsequently impair. It has been held that the legislature has the power to bind the state in relinquishing its power to tax a corporation."

As long as the Penobscot & Kennebec and the Androscoggin & Kennebec Railroad Companies remained distinct and were running their railroads severally, the only taxation that could be imposed upon them was upon the net income over and above ten per centum annually, as provided by § 15 of their respective charters.

There could be no other or different basis of taxation. But it is to be observed that this restriction upon the general power of taxation is applicable to these railroads as several and distinct corporations, having each specific lines of road—each road with its stockholders and directors; for no other corporation is required to keep "a regular account of all their disbursements, expenditures and receipts" for the inspection of governor and council; nor can the treasurer of any other corporation make, at the expiration of each year, an exhibit under oath to the legislature of "the net profits" derived from the income of said railroad as is required by § 14, of their respective charters. As long as these corporations remained distinct, they were exempt from liability to general taxation and subject only to the remotely contingent taxation arising from an excess of income over and above the ten per centum per annum, provided for in § 15. There is no contract with any other corporation. This special taxation must be regarded as limited to these corporations, and as continuing and effective only during their corporate existence and as long as they can comply with their chartered duties and obligations, and no longer.

But, while, as has been seen, the state by contract and for a consideration may exempt specific property from taxation or may limit its amount, the law under which such exemptions are claimed must be clear and explicit in its terms, leaving nothing to doubt or inference. The power of taxation is essential to the existence of government. Its partial or total surrender is never to be presumed. "It has been held many times in this court," observes Mr. Justice Hunt in *Erie Railway Company* v. *Pennsylvania*, 21 Wall. 492, 498, "that a state may make a valid contract that a corporation or its property within its territory shall be exempt from taxation, or shall be subject to a limited and specified taxation.

The court has, however, in the most emphatic terms, and on every occasion, declared that the language in which the surrender is made must be clear and unmistakable. The covenant or enactment must distinctly express that there shall be no other or further liability to taxation. A state cannot strip itself of this most essential power by doubtful words. It cannot by ambiguous words be deprived of the highest attribute of sovereignty. This princi-

ple is distinctly laid down in the cases referred to. It has never been departed from." In *Tucker* v. *Ferguson*, 22 Wall. 527, 575, Mr. Justice Swayne in speaking of the taxing power, says: "It is intended to promote the general welfare. It reaches the interest of every member of the community. It may be restrained by contract in special cases for the public good where such contracts are not forbidden. But the contract must be shown to exist. There is no presumption in its favor. Every reasonable doubt should be resolved against it. Where it exists, it is to be rigidly scrutinized, and never permitted to extend, either in scope or duration beyond what the terms of the concession clearly require." "Every presumption," it is said by the court in *St. Louis* v. *Boatman's Ins. & Trust Co.*, 47 Mo. 155, "will be made against its surrender, as the power was committed to the government to be exercised and not to be alienated."

These corporations with a guaranteed right of limited and restricted taxation obtained from the state an act, c. 651 of the special laws of 1856, authorizing their consolidation into a new corporation which was composed of the corporations consolidating and embracing their several roads.

A new corporation may as well be created by the union under a new organization, of existent and distinct organizations as of individuals. The new corporation is equally distinct from its component part whether composed of corporations or individuals. The old corporations are dissolved except so far as they may be permitted to exist for the purpose of protecting creditors or mortgagees. The corporate rights of the new corporation are those derived from its charter—the act of consolidation—under and by virtue of which alone it began to be and is.

By § 1 of the special act of 1856, certain specified railroads are authorized to consolidate "into one corporation in the manner following :"

By § 2 "The directors of any two or more of said corporations, may enter into the agreement under their respective corporative seals, prescribing the terms and conditions thereof, the mode of carrying the same into effect, the name of the new corporation, the number of directors thereof, which shall not be less than five nor

more than eleven, the time and place of holding the first election of directors, the amount of capital, and the number of shares of the stock of the new corporation, the manner of converting the shares of capital stock in each of said corporations into the shares of such new corporation."

In each section of the act, the corporation coming into existence by virtue of its provisions is termed the *new* corporation.

By the agreement entered into by the two roads first consolidated, it was agreed that they "shall be consolidated into one corporation," and "that the name of the *new* corporation thus created shall be the Maine Central Railroad Company."

Provision is then made for fixing the number of directors, the place of holding meetings, the amount of capital, the number of shares of the stock of the new corporation and the manner of converting the shares of the capital stock of each of the corporations into those of the new corporation.

The fourth and fifth sections of said act are as follows, the preceding ones have provided for an agreement to be entered into by the two corporations to be consolidated under the act:

Sec. 4. "Upon the making said agreement, mentioned in the preceding section, in the manner required therein, and filing a duplicate or a counterpart thereof, in the office of the secretary of state, and immediately upon and after the first election of directors of said new corporation, the said corporations, so making said agreement shall be consolidated and together constitute the new corporation provided for in said agreement, to be known by the corporation name therein mentioned ; and the details of such agreement shall be carried into effect as provided therein ; and such new corporation shall have all the powers, privileges, and immunities, possessed by each of the corporations so entering into said agreement, and be subject to all the legal obligations now resting on them respectively ; provided, however, that nothing in this act shall be construed as extinguishing said consolidated corporations, or annulling their charters; but they shall severally be regarded as still subsisting, so far as their continuance for the purpose of upholding any right, title or interest, power, privilege or immunity, ever possessed, exercised or enjoyed by either of them, may be necessary for the protection

of the creditors or mortgagees of either of them, or of such new corporation ; the separate exercise of their respective powers, and the separate enjoyment of their respective privileges and immunities being suspended, until the protection of such creditors or mortgagees shall require their resumption, when such suspension shall cease, so far and for such time as the protection of such creditors or mortgagees may require.

Sec. 5.   Upon the election of the first board of directors of the said new corporation, created by the agreement of the several companies, all and singular, the *rights, franchise and interest* of the said several corporations so consolidated, in and to every species of property, real, personal and mixed, and things in action, thereunto belonging, shall be deemed to be transferred to, and vested in, such new corporation, without any other deed or transfer ; and such new corporation shall hold and enjoy the same, together with the rights of way, and all other rights of *property, franchise and interest*, in the same manner and to the same extent, as if the said several corporations, so consolidated, should have continued to retain the title and transact the business of such corporation; and the title and real estate, acquired by either of said corporations, shall not be deemed to revert or be impaired by means of such act of consolidation, or anything relating thereto; and all suits that either of said corporations, so consolidated, could have maintained, shall survive to and may be brought in the name of said new corporation.

The defendants' claim to immunity from taxation, or for a limited and conditional taxation, rests only on the word immunities, in § 4.   But to entitle them to immunity they must first of all be enabled or required to make the several returns, and to do and perform the several acts upon which such limited taxation is to be based.   But that they are not so enabled as required, will be fully seen.   Nor is it pretended or alleged that such acts have been done.

Here, then, is a new corporation.   It matters not whether composed of persons or corporations.   The corporations comprising it have no further power to control their assets or direct their own movements.   The new corporation has its stock, its stockholders, its directors, precisely as if the individuals owning stock had or-

ganized to form a corporation. "It is not questioned by the plaintiff," observes Storrs, C. J., in *Bishop* v. *Brainerd*, 28 Conn. 289, "and indeed it could not be in view of the authorities, that a state may create a new corporation out of two or more corporations created by the same state, as well as of two or more natural persons, or that a state may create a corporation composed of natural persons belonging to different states." The legislature can authorize the modified surrender of the old corporations or their total extinction and confer life upon the new one arising from their union. In *McMahan* v. *Morrison*, 16 Ind. 172, three corporations consolidated under act of the legislature authorizing them to merge and consolidate their stock "and make one joint company," and it was held that the effect of the act and of the terms of consolidation under it was a dissolution of the three corporations and the creation of a new one with property, liabilities and stockholders derived from those passing out of existence. These views were sanctioned by the supreme court of the United States in *Clearwater* v. *Meredith*, 1 Wall. 25, 40. In *State* v. *Sherman*, 22 Ohio, 411, it was held, when a corporation in pursuance of an act of the legislature, transfers or conveys its franchise to be a corporation to another, the transaction in legal effect is a surrender or abandonment of its charter by the corporation and a grant by the legislature of a similar charter to the transferees; and the charter so granted is subject to all the provisions of the constitution existing at the time it is so granted. It must be held equally subject to the general laws of the state except when specially, and in direct terms exempted from their operation. In *Hamilton M. Ins. Co.* v. *Hobart*, 2 Gray, 543, a new corporation was held to be created out of the members of several existing corporations. So in *Com.* v. *Atlantic & Great Western Railway*, 53 Penn. St. 9.

Here then, was a new corporation created by the act of 1856, c. 651, § 1, and the proceedings of the consolidating corporations under it. The old corporations existing only so far as may be necessary to protect their several creditors or mortgagees and ceasing to exist, when that necessity shall no longer exist.

The act of consolidation was a special act. It is the grant of a new charter. The new corporation came into existence by vir-

true of and was organized under its provisions. Its corporate life dates from the day of its organization.

It is claimed that the new corporation, by virtue of the act creating it, is exempt from general taxation. Its exemption must arise from that act, if there be such exemption; for it could arise in no other way.

There is no exemption in clear and explicit terms and no inference can be raised in favor of such right. No consideration is shown for such exemption. The roads which were consolidated had been built for a long time. It is not perceived that the public could gain by the consolidation. The act was one conferring a benefit on the stockholders of the old corporations by giving them a charter to form a new one. All they did was to organize under it. In *Tucker* v. *Ferguson*, 22 Wall. 527, it was decided that "an act of the legislature exempting property of a railroad from taxation is not a 'contract' to exempt it, unless there be a consideration for the act;" and that "an agreement when there is no consideration is a nude pact; the promise of a gratuity spontaneously made, which may be kept or recalled at pleasure, and that this rule of law applies to the agreement of states made without consideration as well as to those of individuals." So in *Jones &c. Manufacturing Co.* v. *Commonwealth*, 69 Penn. St. 137, it was held that the right to tax is never presumed to be surrendered except by clear words and for what the legislature deems an adequate consideration. So in *St. Louis* v. *The Boatmen Ins. & Trust Co.*, 47 Mo. 150, 155, the court use this language: "A law which seeks to deprive the legislature of the power to tax must be so clear, explicit and determinate, that there can be neither doubt nor controversy about its terms or the consideration which renders it binding."

In *Christ Church* v. *Pennsylvania*, 24 How. 300, an act was passed providing "that the real property, including ground rents, now belonging to Christ Church Hospital in the city of Philadelphia, so long as the same shall belong to said hospital, shall be and remain free from taxes." "This concession" of the legislature remarks Mr. Justice Campbell, "was spontaneous, and no service or duty, or other remunerative condition was imposed upon the

corporation. . . It is in the nature of such a privilege, that it exists *bene placitum*, and may be revoked at the pleasure of the sovereign."

If a consideration·to the state is necessary to the validity of its surrender in whole or in part of its sovereign right of taxation, it is difficult to perceive what is the consideration rendered on the part of the defendant corporation.

But while there is no surrender in terms of the general right of taxation and no special limitation of that right in the act of consolidation, it is claimed that the new corporation is subject only to the special and limited mode of taxation prescribed by § 15 of the charters of the two corporations, which have, by the act of consolidation and the organization under it, become the new corporation. The new corporation—the defendant corporation, to entitle itself to the special exemption from general taxation must be able to do what the corporations composing it were required to do. The lines of road and the stockholders of the defendant corporation differ from those of the two consolidating corporations. But these corporations are only entitled to claim the limited and restricted taxation provided by § 15 of their charters. The defendant corporation cannot comply with the· requirements of those charters. No provision is found in the defendants' act of incorporation requiring their directors to make the returns to the legislature required by § 14, of the charters of the consolidated companies, or that the then treasurers should make the payment, which the treasurers of those companies were required to make by § 15, upon the happening of the contingency therein specified. And if there had been, it would not be a compliance with the charters of the consolidating corporations ; for the directors and treasurers would not be the directors and treasurers of the Androscoggin & Kennebec and of the Penobscot & Kennebec companies, who alone were by their charter to made the required returns and payments. Nor is any power or direction given to the defendant corporation to ascertain when the net income shall exceed ten per centum per annum. Nor could they do it, if they would. The assets of both corporations have become commingled and united. It has become impossible to show what would have been the net income of each

without consolidation, because it is impossible to prove to what extent the profits of each have been affected by the consolidation. And if they could do it, it would not be a compliance with the charters of these companies, because it would be done by those not authorized to do it and not by those upon whom these duties were imposed.

It may be said that each corporation has a limited existence for certain purposes. Granted ; but what are those purposes ? By § 4, of the act of consolidation, "They shall severally be regarded as still subsisting so far as their continuance for the purpose of upholding any right, title or interest, power, privilege or immunity ever possessed, exercised or enjoyed by either of them, may be necessary for the protection of the creditors or mortgagees of either of them or of such new corporation. The separate exercise of their respective powers and the separate enjoyment of their respective privileges and immunities being suspended, until the protection of such creditors or mortgagees shall require their resumption, when such suspension shall cease, so far and for such time as the protection of such creditors or mortgagees may require." It is obvious that the separate existence of these corporations is only and exclusively continued for the protection of creditors and mortgagees. That being accomplished, they have no longer nor further corporate existence. They have, the consolidation being perfected and all debts paid, neither organization, stock, stockholders nor assets. They cease to be. They have no directors to make returns, no net or other income, and no assets, so that if there was a net income ascertainable for each corporation, there would be no treasurer to pay it and no possible funds from which it could be paid.

That the several existence of the consolidated corporations is only for the purpose of securing their creditors is further shown by § 7, which provides in case the new corporation fails to pay the mortgages of either of the consolidating corporations, "the corporation which executed said mortgage shall again exercise and possess, separately, all its original powers, privileges and immunities, so far as the protection of the interests of such mortgagees may require." The act assumes that both corporations have only

the qualified right to be and to act, when necessary for the protection of their creditors and only so far as may be required for that purpose.

It has already been remarked that the defendant corporation has no exemption from limited or general taxation by the terms of the act creating it. The corporations out of which it is created cease to exist or exist only for special purposes. The defendant corporation is neither required to "keep a regular account of all their expenditures, disbursements and receipts," nor those of the corporations of which it is composed, nor is their treasurer to make an exhibit under oath of the net profits of their road or of the roads by whose fusion it exists. No basis is laid for the limited taxation claimed. It cannot claim a right to a limited taxation of its franchise; for it is not in the act. It cannot claim exemption under the corporations composing it; for it cannot do and perform what was required of them. The new corporation has assets, stock, directors, etc., but by its voluntary acceptance of its charter it is unable to discharge the duties upon which conditional immunity depends. It is not to be presumed that the legislature has surrendered its right of taxation of the new corporation, especially when it is obvious there is no consideration for such surrender.

The Maine Central Railroad Company first existed as a corporation on October 28, 1862, under the provisions of the special acts approved April, 1856, and amended March 17, 1862. This act of 1856, was an act of incorporation equally with the acts incorporating the two corporations therein named.

Now by c. 503, of the general laws of 1831, it was enacted "that acts of incorporation which shall be passed after the passage of this act, shall at all times hereafter, be liable to be amended, altered or repealed, at the pleasure of the legislature, in the same manner as if an express provision to that effect were therein contained ; unless there shall have been inserted in such act of incorporation an express limitation or provision to the contrary."

The act of 1831, was a public act, and has remained in force to the present time. All special acts of incorporation are subject to its provision. All parties are presumed to act with a full knowledge of its terms and their legal effect. In *Tomlinson* v. *Jessup,*

15 Wall. 454, 458, Mr. Justice Field, in reference to a similar statute, says : "The power reserved to the state by the law of 1841, authorized any change in the contract as it originally existed, or as subsequently modified, or its entire revocation. The original corporators, or subsequent stockholders, took their interests with knowledge of the existence of this power, and of the possibility of its exercise at any time in the discretion of the legislature. The object of the reservation, and of similar reservations in other charters, is to prevent a grant of corporate rights and privileges in a form which will preclude legislative interference with their exercise, if the public interest should at any time require such interference." When immunity from taxation constitutes a part of the contract, it is "by the reservation of power such as is contained in the law of 1841, subject to be revoked equally with any other provision of the charter whenever the legislature may deem it expedient for the public interests that the revocation shall be made." When there is a law of the state reserving to the legislature the power to alter, amend or withdraw any privilege granted by such charter, this reservation qualifies the grant ; and a subsequent exercise of the reserved power is not within the prohibition of the federal constitution, as an act impairing the obligation of contracts. *West Wisconsin Railroad* v. *Supervisors of Trempaleau County*, 35 Wis. 257. In this state it has been held that the act of 1831, applied to all subsequent acts of incorporation. *Bangor, &c. Railroad* v. *Smith*, 47 Maine, 34. So in *Roxbury* v. *Boston & Providence Railroad*, 6 Cush. 424, Shaw, C. J., in reference to a similar act of Massachusetts, says: "The defendants, then, having accepted their charter, after the above act, and whilst it was in force, took the charter subject to those provisions, and must be bound by any reasonable amendment and alteration, which the legislature might thereafter make."

"Charters subsequently granted," remarks Mr. Justice Clifford, in *Holyoke Co.* v. *Lyman*, 15 Wall. 500, "must be understood as standing just as they would if that reservation of the power to amend, alter or repeal the same, had been incorporated into each charter." "Where such a provision is incorporated in the charter," observes the same learned judge, in *Miller* v. *The State*, 15

Wall. 488, "it is clear that it qualifies the grant, and that the subsequent exercise of that reserved power cannot be regarded as an act within the prohibition of the constitution. Such power also, that is, the power to alter, modify or repeal an act of incorporation, is frequently reserved to the state by a general law applicable to all acts of incorporation, or to certain classes of the same, as the case may be; in which case it is equally clear, that the power may be exercised whenever it appears that the act of incorporation is one which falls within the reservation, and that the charter was granted subsequent to the passage of the general law, even though the charter contains no such condition, nor any allusion to such a reservation."

Now bearing in mind the uniform doctrine of the authorities, that all presumptions are in favor of the state, and that a surrender of the taxing power can only be established by the most clear and explicit language, one will look in vain in the defendants' act of incorporation for "any express limitation or provision" restraining the general right of the legislature to amend, alter or repeal the same. And if not, that right exists "in the same manner as if an express provision to that effect were therein contained."

The right to amend, alter or repeal, is reserved by a general law applicable to acts of incorporation which may be passed after 1831. No "express provision," negativing or restricting this reserved right of the legislature, can anywhere be found. It must be shown by unmistakable language, not by implication or forced construction of the words used. Nor can it be said that the act under which the defendant corporation has organized, is not an act of incorporation. It is an act of incorporation. If the stockholders of the respective corporations had been incorporated, it would have been one. It is none the less so by the incorporation into a new corporate body of previously existing corporations. It incorporates by consolidation. It none the less incorporates, because it consolidates. It is none the less an act of incorporation, because it is an act of consolidation. "There is no particular form of words requisite to create a corporation," observes Chancellor Kent, in *Denton* v. *Jackson,* 2 Johns. (N. Y.) Ch. 324. "A grant to hold mercantile meetings has been held to confer a corporate capacity."

The Portland & Kennebec Railway Company was incorporated by an act approved April 1, 1836. But in the charter there was no limitation upon the right of the state to tax. By an act in addition to the act incorporating this company, approved March 31, 1845, c. 273, § 3, the right to tax was limited to the surplus over ten per centum per annum, as provided by § 15, of the corporations whose rights we have already considered.

This road was authorized to issue bonds and secure them by a mortgage of their railroad by c. 220, of the acts of 1852. The mortgage debts not being paid, the mortgagees foreclosed the same, under the provisions of R. S. 1857, c. 51, and organized a new corporation.

Assuming that the amendment of 1845 placed this corporation in the same condition as to exemption from taxation, as if it had been a part of its original charter, then the question arises whether the new corporation formed of the mortgagees and bondholders of the old one, succeed to the exemption from general taxation, which was conferred upon the defaulting corporation through whose default it exists.

By R. S. 1857, c. 51, § 57, it is provided that "if the foreclosure of the mortgage be effectuated, it shall enure to the benefit of all the holders of bonds and coupons provided for in its condition. And they, their assigns and successors, are hereby constituted a company incorporated and chartered as of the day of the foreclosure, for all the purposes of the original company, with all the chartered and legal rights and immunities, which pertained to the original company at the time of foreclosure ; and it shall be the duty of the trustees by suitable deed of release, to convey to such new company all the rights and interests by them held in said railroad, appurtenances and franchise, and other property by virtue of their deed of trust, and the foreclosure thereof," &c.

By § 58, provision is made for the organization of "*this new corporation, though a distinct one.*"

By § 60, "the original corporation shall continue in existence for the sole purpose of collecting and paying its debts, and bringing its unsettled matters to a close."

The exemption from general taxation was conferred upon the

original corporation. "In the case of a corporation," observes Mr. Justice Field, in *Tomlinson* v. *Jessup*, 15 Wall. 454, 459, "the exemption, if originally made in the act of incorporation, is supported upon the consideration of the duties and liabilities which corporators assume by accepting the charter." But whatever equitable claims the original corporation may have for its qualified exemption from taxation, the new corporation has none such. The new corporation is composed of a different body altogether— the mortgagees of the original railroad. The stock is co-extensive with the mortgage debt. The railroad has been built, and the new corporation has no peculiar claims as creditors of the old one for the exemptions, which in part induced its building.

The old corporation exists for "the sole purpose of collecting and paying its debts," &c. But it does not exist for the purpose of paying taxes. Nor is a tax a debt.

If a tax should accrue to the state by c. 273, § 3, of the acts of 1845, the old corporation would not be responsible for it. Nor would the new; for the obligation is not specifically imposed upon it.

But however this may be, the new corporation first came into existence on May 20, 1862. It was "*a new corporation, though a distinct one.*" It was a corporation created under the provisions of R. S. 1857, c. 51. But this general law is an act of incorporation, an act by and under which corporations come into existence. It is none the less an act of incorporation because more than one may be created by action under it. Now the act of 1831, c. 503, is found in R. S. 1857, c. 46, § 17, relating to corporations. Both these acts, c. 51, and c. 46, are found in the same revision. They were passed at the same time. They apply to the same subject matter. They must be construed together. Corporations created by a general act of incorporation, are as much within the reasons which induced the enactment of § 17, as corporations created by a special act. It is equally desirable that the state should reserve its general power of modifying or repealing charters in the one case as the other. This reservation is found in the act relating to "corporations," and must apply to all acts of incorporation whether general or special, in which "an express limitation or provision to the contrary" shall not have been inserted.

But no "limitation or provision" restricting the legislature in the exercise of its reserved right to amend, alter or repeal, is to be found in the act of 1857, c. 51, under the provisions of which the new corporation, the Portland & Kennebec Railway, derived its corporate existence.

Nor is this all. By the act of 1857, c. 106, being additional to an act to incorporate the Kennebec & Portland Railroad Company, authority was given to that corporation "to alter the location of its road, or any part of it," between certain specified points. The alteration authorized was duly made. But by § 3, "said railroad company is hereby made subject to all the general laws of the state relating to railroads." Consequently before the new corporation composed of its mortgagees was formed, it had lost by its own act whatever immunity it may have had from general taxation, and became subject to the provisions of R. S., c. 46, § 17, by which the state reserves the right to alter, amend or repeal charters granted by its authority, a reservation which applies to all corporations whatsoever, railroads as well as all others.

The Leeds & Farmington Railroad Company was formed by the incorporation of the mortgagees of the Androscoggin Railroad, on May 11, 1865, and is within the same category as the Portland & Kennebec Railroad Company.

Further, by c. 238, § 4, of the laws of 1864, "every railroad corporation that shall be formed by the foreclosure of a mortgage of any railroad heretofore or hereafter made, shall be subject to such laws as the legislature have enacted, or shall hereafter enact concerning railroads, anything in the original charter to the contrary notwithstanding."

This act was passed before the incorporation of the last named company, and is applicable to it, even if its application to other corporations previously formed should be denied.

The acts of consolidation, by which the defendant corporation exists, refer to the powers, privileges, etc., of the corporations which constitute the new corporation thereby created. The reference is in the most general language. It has been held that an act creating a corporation with the powers and privileges of another corporation formerly created, by reference, without setting

them forth should be construed strictly against the corporation, when the rights of others are concerned. *Bowling Green, &c. Railroad* v. *Warren County Court,* 10 Bush, (Ky.) 711. Much more should they be construed strictly as against the new corporation, when the essential sovereignty of the state in the matter of taxation is involved.

It has already been seen that the Maine Central Railroad Company under its organization had no immunity from taxation.

On November 16, 1874, the last consolidation and incorporation took place. The new corporation was formed of corporations which had no claim for exemption as well as of those which had such exemption. By the act of consolidation and incorporation the new corporation is to "have all the powers, privileges and immunities possessed by each of the corporations entering into the agreement of consolidation." It does not say it shall have all the powers, privileges and immunities possessed by each and any one, or any two of the corporations. Now some had a conditional and qualified immunity from taxation and some had it not. When the new corporation was organized it was a unit. All the powers, privileges and immunities which the new corporation was to have were those which each had, not all those which any or either one had. "Each" means "every one of any number separately considered." "All" means "every one or the whole number of particlars"—"the whole number." Now where the grant is made of the privileges, powers and immunities of each of the old corporations to the new one, it certainly carries the privileges, powers and immunities which they all (*i. e.* every one of them all,) had, and it just as certainly excludes those special privileges which some of them had and some of them did not have. It is not a grant of the privileges, powers and immunities which all collectively or either one, or any two of them had, but of those which every one of them, all had—to be exercised for the good of the new corporation as a whole, upon the territory and property which the old corporations had before possessed and controlled in severalty.

The line of road of the new corporation was different from that of the corporations out of which it was incorporated. The new corporation had different stockholders and different assets. It

could not have been the legislative intention that a fraction of this consolidated railroad should have a qualified immunity from taxation and a fraction not have it. Still less could it have been the intention to confer it when it did not previously exist. Every presumption is against the surrender by the state of any portion of its sovereignty and especially that of the right of taxation.

But each of "the corporations entering into the agreement of consolidation" had no immunity from taxation. Some had it and some had it not. This, therefore, is not an immunity which the defendants can claim under the act of consolidation and incorporation. The new corporation would have only the privileges, powers and immunities which the corporation with the least powers, privileges and immunities possessed and which were common to them all.

Further, it is a well settled principle of law that when a creditor has two classes of claims against his debtor, by uniting them in one suit and obtaining judgment, he reduces that, in which his rights are superior to the level of that, in which his rights are inferior. *Bicknell* v. *Trickey*, 34 Maine, 273. *Miller* v. *Scherder*, 2 Comst. (N. Y.) 262. As for instance by joining lien debts and non-lien debts in one suit and obtaining judgment, the priority of right, which a portion of the debt was entitled to before such joinder, is lost. The lien claim is extinguished. So here, by the consolidation of corporations claiming an exemption from general taxation with those not thus exempt, the right of limited and conditional taxation exists no longer in favor of those which had that right, it being impossible in this confusion of estates to ascertain when the contingency would happen,—when the fraction of the new and consolidated corporation would become liable to the special and limited taxation prescribed in the charter of such fraction as it existed before consolidation. The acceptance of the new charter is a surrender of exemptions as before existing. The state makes no surrender of any of its general rights of sovereignty or of its reserved rights.

That this is the true construction, is abundantly manifest by reference to § 5 of the act of consolidation, which provides that "all and singular, the rights, franchise and interest of the said sev-

eral corporations, so consolidated, in and to every species of property, real, personal and mixed and things in action, thereunto belonging, shall be deemed to be transferred to, and vested in, such new corporation, without any other deed or transfer; and such new corporation, shall hold and enjoy the same, together with the rights of way, and all other rights of property, franchise and interest, in the same manner and to the same extent as if the said several corporations, so consolidated, should have continued to retain the title and transact the business of said corporation." Now the words "rights, franchises and interest," do not include exemption from taxation, yet they represent what the new corporation is to have. "Rights and interest" certainly do not. Neither does the word "franchise" include such exemption. "The franchises of a railroad corporation," observes Mr. Justice Field in *Morgan* v. *Louisiana*, 3 Otto, 217, "are rights or privileges which are essential to the operations of the corporation, and without which its road and works would be of little value; such as the franchise to run cars, to take tolls, to appropriate earth and gravel for the bed of its road, or water for its engines, and the like. They are positive rights or privileges without the possession of which the road of the company could not be successfully worked. Immunity from taxation is not one of them." "The rights, franchise and interest in and to every species of property," howsoever described, are by force of the act transferred to the new corporation and nothing more; and this language does not include immunity from taxation, whether general or special.

But, as before observed, immunity from general taxation was to be preceded by acts which, after consolidation, the old corporations could not do and which the new corporation was not authorized to do for them and was not required to do for itself.

The reasons already given, arising from their being no provisions for the new corporation making the returns required for the basis of the special and limited taxation authorized by the charters of the corporations entering into consolidation or for the old corporations doing and performing what was to be done and performed by them, apply with increased force in the case of the last consolidation and incorporation. No provision is found, to determine

when the state would be entitled to its tax, as provided by § 15 of the charters of the consolidating corporations. There is no basis upon which it can be ascertained. Is it upon the surplus over the ten per centum of the net income of the costs of all the roads entering into the new corporation? But that would not be in accordance with their several charters; for the assessment would depend upon the several earnings of the several roads. If it is to be on the several net incomes of the several roads, will it be upon the original costs of the roads foreclosed by the mortgagees, or upon the mortgage debts for which they were foreclosed? If the taxation is to be determined by the separate costs of the several railroads, each railroad entering into consolidation paying the tax on its cost, it will be manifestly impossible to assess such tax when the disbursements and receipts are commingled and the amounts received and paid out are affected as they must be by this union of these several corporations. But besides establishing no basis of taxation, no provision is made for returns "of the disbursements, expenditures and receipts" of the several roads of the aggregate corporation, or of the several fractions of the corporate union, which at the last incorporation by consolidation were exempt from taxation, when the new corporation was formed, composed of all the roads entering into consolidation.

The exemption from taxation of any of the consolidating roads is based upon their previous compliance with the requirements of § 44 of the charters of the corporations first consolidated. But it is apparent there is no mode provided by which they can be complied with, no conceivable basis established for the limited and conditional taxation claimed, so that in its results the defendants claim will lead to the entire exemption of the new corporation from taxation without its making the returns required—a result never intended by the legislature. The corporations, by incorporating under an act disabling them from performing the pre-requisites to their limited and conditional taxation, must be regarded as surrendering all right to such limited exemption from taxation.

The new corporations, whether under the first or second consolidation, have no specific immunity from taxation in the acts under which they are organized. Had the act of 1831, c. 503, been in-

serted in the charters, or in the act authorizing consolidation, the power to alter, amend or repeal would authorize the repeal of the immunity from general taxation as much as any thing else. But as has been repeatedly decided, the act is as much a part of the act under which the defendant corporation claims the right to organize and become a new corporation, as if inserted.

It results, that :

When a new corporation is formed out of two or more previously existing corporations, and by the act creating it, is "to have the powers, privileges and immunities possessed by each of the corporations whose union constitutes such new corporation, the new corporation will have "privileges, powers and immunities which they all (*i. e.* every one of them all) had, and it will not have those special powers, privileges and immunities which some had, and some did not have.

That, when two or more corporations with a special immunity from general taxation, the amount of such taxation being dependent upon certain precedent acts to be done by such corporation thus to be exempted, are incorporated into a new corporation which is unable, and is not required, to do or perform the acts which must precede such special taxation, the new corporation thus created cannot claim the special immunity belonging to the corporations out of which it is composed.

That, corporations formed by the action of the mortgagees of insolvent corporations and those formed by the consolidation of pre-existing corporations are new corporations, both by the rules of the common law and by the express terms of the statutes under and from which they derive their corporate existence—that, as such new corporation, they are subject to the general law of 1831, c. 503, which has been continued in force to the present time, and consequently they are liable to taxation.

As no exemption was granted in specific terms, the remark of Mr. Justice Clifford in *Holyoke* v. *Lyman*, 15 Wall. 500, is peculiarly applicable—that, "what is not granted in such acts is taken to be withheld."

It must be a clear and manifest violation of the constitution, which will justify a court in declaring an act of the legislature

void. "It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body by which any law is passed," remarks Mr. Justice Washington in *Ogden* v. *Saunders,* 12 Wheaton, 214, 270, "to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt." Here no doubt exists.        *Judgment for the state.*

DICKERSON, BARROWS, DANFORTH and VIRGIN, JJ., concurred.
LIBBEY, J., concurred in the result.